## WATSON v. FORD.

(Circuit Court of Appeals, Sixth Circuit. March 7, 1899.)

No. 612.

CONSTRUCTION OF CONTRACT—IMPLIED CONDITIONS—WHEN OF THE ESSENCE OF THE CONTRACT.

Defendant contemplated the establishment of works for the manufacture of soda ash and other chemicals, in which a large amount of capital would be required. Previous success in the manufacture of soda ash commer-

cially had been due to the use of patented processes and machinery. Plaintiff was a chemical engineer, and a reputed expert in the designing of machinery for soda ash manufacture, with which he was experimenting. The parties entered into a contract, by which plaintiff engaged to devote his entire time and skill to the service of defendant in his business for three years, for which he was to receive a yearly-increasing salary, and, if the business was made commercially successful, a bonus in stock of the manufacturing company to be then formed. The contract contained a provision that any inventions or discoveries made by plaintiff during the term relating to the manufactures contemplated should be disclosed to defendant, and, if deemed advisable, should be patented, at his expense, for the joint and equal benefit of the parties. *Held*, that such provision was an essential part of the consideration for the defendant's obligation, and constituted an implied condition, a breach of which by plaintiff justified the termination of the entire contract by defendant, and relieved him from liability for future salary or for the delivery of the stock; plaintiff having been paid his salary to the time of his discharge.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This was an action to recover damages for a breach of the following contract:

"Agreement made this 29th day of April, Anno Domini one thousand eight hundred and ninety-three, between J. B. Ford, first party, and John Robert Watson, second party, witnesseth: Whereas, said first party is the owner of certain property and improvements situate at Wyandotte, Michigan, and contemplates the use and operation thereof for the purpose of manufacturing soda ash and other chemicals; and whereas, said second party is by profession a chemical engineer, and has skill and experience in the business proposed to be conducted by said first party: Now, this agreement witnesseth that, in consideration of the respective covenants of the parties hereinafter set forth, it is agreed, by and between the parties, as follows, to wit: First. Said second party shall and will give unto said first party his services and his entire time, skill, and attention in and about the business proposed to be conducted by said first party, as aforesaid, at Wyandotte, Michigan, for and during the term of three (3) years, from April 3, 1893, and that during said term he will not willfully neglect or depart from said employment, nor do or cause, or willfully suffer to be done or caused, any act or thing whatsoever to the prejudice of the said first party in or about said business, but, on the contrary, shall and will order and direct all workmen, servants, and persons employed in and about said business to do their work, service, and duty to the utmost of his skill, knowledge, and ability, and for the highest profit and advantage of the said first party. Second. Said first party shall and will pay unto the said second party for his said services the just and full sum of two thousand seven hundred and fifty dollars ($2,750) for the first year, three thousand two hundred and fifty dollars ($3,250) for the second year, and three thousand seven hundred and fifty dollars ($3,750) for the third year, each of said annual sums to be paid in monthly payments. Third. As soon as the works of said first party shall have been placed in successful operation under the processes and methods adopted by said second party, so as to manufacture soda ash at a commercial profit, said first party agrees to form a corporation, under the laws of Michigan, for the purpose of conducting said business, the capital stock of which shall be paid by the transfer to said corporation of the entire property, assets, and effects used or employed in or about said business; and upon the formation and organization of said corporation said first party shall and will further pay and deliver unto the said second party five-ninths of two per cent. (5/9 of 2 per cent.) of the whole amount of said capital stock, in full-paid shares. Said second party shall not, at any time, sell the whole or any part of the stock mentioned in article 'third,' without first offering the same to said company; and that, when offered, said company shall have the right of purchasing the same at the value actually as shown by the books and accounts of the company. Fourth. Should second party, during

said employment, make any inventions or discoveries pertaining to, or of use or advantage in, the business of manufacturing chemicals, the same shall be made known unto said first party; and, if so requested by said first party, said second party shall and will, at the cost and expense of said first party, procure letters patent therefor, the same to be granted and issued to and for the parties hereto, as joint owners in equal shares; but, should said first party, within three (3) months' notice of any such invention or discovery, fail or decline to avail himself of the option or privilege hereby granted, said second party shall be at liberty to procure letters patent in his own name, and for his own use and benefit. Fifth. Should it become apparent, in the judgment of the said first party, at the expiration of the period of six (6) months from and after the date at which the actual operation shall have begun, that said second party has not made the operation a commercial success, or cannot do so, owing to the inefficiency of the plant and process employed by him, the said first party, at his option, may terminate this agreement by giving thirty (30) days' notice of his intention to do so. In witness whereof, the said parties have hereunto set their hands and seals, the day and year first aforesaid.

"J. B. Ford. [Seal.]
"By J. B. Ford, Jr.
"John R. Watson. [Seal.]"

It appears that the plaintiff, John R. Watson, entered the employ of the defendant under the contract, and remained in such employ until the 28th day of June, 1894, and received the monthly installments upon his salary due down until that day. Upon that day Watson declined to comply with the fourth paragraph of the contract, and refused to assign to the defendant a half interest in certain patents which Watson had taken out for inventions or discoveries pertaining to the business of manufacturing chemicals during said employment. He was given 24 hours' time within which to comply with the request. He refused, and was discharged. The sole question which the court finds it necessary to consider in this case is whether a breach of the fourth paragraph by Watson, the party of the second part, is such a breach as releases the first party from a further compliance with the contract on his part; or, in other words, whether the second and third stipulations are, with the fourth, dependent or independent covenants or conditions. The court below held that compliance with the fourth covenant by Watson whenever circumstances should arise making it operative was a condition precedent to a continuing obligation on the part of the defendant to pay future installments of wages or to transfer the stock mentioned in the third paragraph. The court, therefore, held that a breach of the fourth stipulation defeated Watson's right to subsequent salary or to the stock.

T. E. Tarsney, for plaintiff in error.
Otto Kirchner and W. J. Gray, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts as above). Ford was about to invest a great deal of capital in a new and experimental business. The making of soda ash had been commercially successful when a certain patented process was used, but the field was not fully explored. There was believed to be room for extensive development and improvement in the process of manufacture. Watson was a reputed expert in designing and making machinery for the successful production of soda ash. It was a business in which the ownership of patents was exceedingly important. The contract, shortly stated, was that Watson, on his part, was for three years to devote his entire time and skill to the designing, erection, maintenance, and operation of a soda ash making plant, for the benefit of Ford so exclusively that Ford should have a one-half interest in all patents which Watson

might take out for improvements in the process or machinery used in the manufacture; while Ford, on his part, was to pay Watson an increasing annual salary, in monthly installments, and a bonus of company stock in the end, should the experiment be a commercial success. The salary and stock were the consideration for the services, skill, and patented discoveries. The question is whether the conveyance of the patent was an implied condition of further obligation of Ford to pay the future salary and the stock. Prof. Langdell, in his summary of the Law of Contracts, points out that breaches of implied conditions are divisible into two classes, according as they take place before any part of the condition has been performed ("in limine," as he terms it), or during the progress of its performance. Section 160. He says:

"Breaches of the latter class, which may be termed breaches after part performance, give rise to different considerations; for, if such a breach disables the party committing it from suing, the result may be that ne will receive nothing for what he has already done, and that the other party will receive the benefit of the part performance without paying for it. If the breach goes to the essence of the contract, the party committing it cannot complain of this result; but if it is slight and unimportant, and especially if it happens after the performance is nearly completed, he may justly say that the penalty is out of all proportion to the wrong."

After pointing out that an express condition is to be enforced according to its letter, because the result of agreement, the learned author proceeds:

"An implied condition, on the other hand, is the creature of the court, and the court is therefore responsible for its consequences. If it is permitted to work injustice, the only excuse for the court is that it is unavoidable; and, if it is permitted to work more injustice than it prevents, not even that excuse is available, for, assuming it to be true, it shows that the condition has no right to exist. This responsibility rests upon the court, not only because an implied condition is its creature, but because, being its creature, the court has the power of molding it as the purposes of it require. * * * Influenced by the foregoing considerations, courts of law have adopted the principles of courts of equity (so far as their procedure would admit of their doing so) in respect to breaches of implied conditions after part performance; and therefore, if the breach goes to the essence, they permit it to be set up as a defense; but, if it does not go to the essence, they permit the plaintiff to recover, and leave the defendant to his cross action."

The principles above stated are illustrated in many cases, to some of which we may properly refer. In Leopold v. Salkey, 89 Ill. 412, the action was for damages for breach of a contract of employment. By the contract, the plaintiff agreed to serve the defendant as superintendent in a mercantile business for three years, at a fixed salary. The defendant pleaded that the plaintiff, after entering the employment, was absent two weeks. The plaintiff showed that he had been arrested, without fault on his part, and detained in jail for the two weeks of his absence, and that, on his release, he at once tendered his services. The defense was sustained, on the ground that the two weeks' absence from duty was a breach that went to the essence of the contract. In Johnson v. Walker, 155 Mass. 253, 29 N. E. 522, an action to recover the balance due upon a contract to work for defendants for a year as foreman in a shoe shop, it appeared that

the plaintiff, after working a part of the year, and receiving pay therefor at the stipulated rate, became ill, and was necessarily absent from work seven weeks, and that when, upon recovery, he offered to resume work, he was informed that he had been discharged, and a man hired in his place. Judgment was given for defendants. The court said:

"Whether a temporary illness of a few hours, or, in some instances, perhaps, of a few days, would in all cases come within the implied condition, we need not consider. In the present case, the plaintiff was sick about seven weeks, and during all that time, as the exceptions state, was incapacitated from work in the defendants' shop. We think that, as matter of law, this constituted such an interruption of and failure to perform his contract, on the part of the plaintiff, that the defendants were justified in terminating it and employing another person in his place."

In Powell v. Newell, 59 Minn. 406, 61 N. W. 335, a patient made a contract with a physician for a year's treatment, giving his note for the stipulated compensation. In a suit on the note, the defense was that defendant had applied to the physician for treatment, and could not see him because the physician was ill. Nothing was said to defendant as to how long he might have to wait for plaintiff's services. It was held that this was a good defense to the note. In Poussard v. Spiers, 1 Q. B. Div. 410, the action was on a contract for the employment of the plaintiff's wife as a leading opera singer, for a season of three months. She attended most of the rehearsals, but was by illness prevented from attending the first three or four public performances. It was held, as matter of law, that the plaintiff's inability to perform at the opening and early performances went to the root of the matter, and justified the defendants in rescinding the contract. In Fillieul v. Armstrong, 7 Adol. & E. 557, on the other hand, it was held that the failure of a French teacher engaged for a year to report for duty for three days after a vacation did not justify his discharge. In Bettini v. Gye, 1 Q. B. Div. 183, the action was for breach of a contract to employ plaintiff as a singer for a season of three months in theaters, halls, and drawing rooms. The plaintiff stipulated not to sing in England for three months before the engagement, and agreed to be in London six days before March 30th for rehearsals. He was detained by illness so that he was four days late, and could only give two days for rehearsals. It was held that this breach did not go to the root of the matter, and did not constitute a defense; that, if the contract had been for a season of opera, rehearsals would have been most important, and failure to attend them might have been a fatal breach, but here the singing was to be of a great variety. More than this, the singer had been obliged to abstain from earning money by his voice in England for three months before the rehearsals without compensation, which afforded a strong argument for saying that subsequent stipulations were not intended to be conditions precedent, unless the nature of the thing strongly showed they must be so. The reasoning of Mr. Justice Blackburn in the last case suggests one of the considerations which should be very persuasive with a court in determining whether a covenant involves an implied condition, and that is the extent of the penalty to which

such a construction must subject the defaulting party. As Prof.. Langdell says in his Summary of the Law of Contracts (section 168):

"The following rules are to be taken, however, only as illustrations of the more general rule that a part performance, in order to raise an equity in the plaintiff's favor, must substantially change his position, to his own detriment and to the defendant's benefit; or, if not to the defendant's benefit, at least to his own detriment. It seems, therefore, that the slightest breach of condition will authorize the throwing up of a contract, whenever it can be done without putting the plaintiff in any worse position substantially than he would be in if the contract had not been made."

In the light of the foregoing authorities, we come to consider the case at bar. It is a case of part performance and a default. Is the default a breach of an implied condition? Does the failure to convey the patents go to the root and essence of the contract? Ford was seeking to establish a great business, the life of which was intended to extend far beyond the three years of Watson's employment. Watson was experimenting. His successful discoveries Ford necessarily counted on as material aids to success, and it was of the highest importance that he should secure such a title to those discoveries that he might use them and prevent others from using them. Previous success in the same business had been due to patented processes and machinery, and it was vital that Ford should protect his interest in discoveries and improvements he was paying so much to secure. Should Watson retain the right, after a successful development of the business, to prevent the use of such improvements as he might invent, it would materially interfere with the success of the enterprise. The agreement that Ford should share in the ownership of the patents was a material part of the consideration for which he was to pay Watson's salary and stock bonus. The contract affords no method by which any particular part of the consideration can be apportioned to the conveyance of the patents. That was merely part of the service, and an important incident to the devotion of all of Watson's time and skill to the new business. Watson received monthly pay for his services down to the day of his discharge. A construction of the contract which makes his refusal to convey the patents a breach of an implied condition does not visit him with the penalty of loss of pay for any work actually done. He had a chance of receiving a stock bonus; but this was remote and contingent, for Ford had the option, at the end of six months after actual operation began, to terminate the contract if he thought it not to be a commercial success. Considering the importance of the patent rights in the business, and the lightness of the penalty imposed for breach of the condition if implied, we hold that the breach went to the essence or root of the contract, and that the defendant, Ford, was entitled with the covenants on his part to be performed. Cadwell v. Blake, 6 Gray, 402, 411. The judgment of the circuit court is affirmed.